AFFIDAVIT IN SUPPORT OF A SEIZURE WARRANT

PAUL CAVANAGH, being duly sworn, deposes and states as follows:

## INTRODUCTION

1. I am a Special Agent ("SA") employed by the Federal Bureau of Investigation ("FBI"). I have been so employed for three (3) years. Currently, I am assigned to the Asset Forfeiture/Money Laundering Squad in the FBI's Washington, D.C. Field Office ("WFO"). My duties include investigating the asset forfeiture aspects of suspected violations of federal law, including money laundering, in violation of 18 U.S.C. § § 1956 and 1957, as well as, health care fraud, mail fraud, wire fraud, and bank fraud under Title 18, United States Code. I also investigate the asset forfeiture aspects of narcotics violations under Title 21, United States Code. I have received extensive training in advanced money laundering techniques and complex financial manipulation.

2. I am currently assisting SA Mark Dargis, FBI, WFO. SA Dargis is assigned to work Health Care Fraud violations. The statements contained in this affidavit are based in part on reports and conversations provided by SA Dargis, other special agents of the FBI, special agents of the Office of Inspector General, United States Department of Health and Human Services ("OIG, HHS"), and other law enforcement officers who are familiar with this investigation. In addition, I have reviewed records and documents recovered on April 11, 2006, during the execution of search warrants pertaining to this case.

3. This affidavit is in support of a seizure warrant for the following items:

All funds and other things of value in the following Bank of America accounts:

**Account # xxxxxxxxxx1887, held in the name of Martin R. McLaren**
**Account # xxxxxx7669, held in the name of McLaren Anesthesia Associates, PC**

4. Based on my training and experience as described above, my personal participation in this and other financial investigations, and discussions with other federal and local law enforcement personnel who are knowledgeable of financial investigations and health care fraud investigations, I know that health care providers who submit fraudulent claims to health care programs, like Medicare:

    a. seldom restrict their fraudulent billing to one health care program;

    b. alter patients' files to support fraudulent claims;

    c. launder proceeds through various bank accounts; and

    d. bill health care benefit programs for services not rendered.

5. As discussed in detail below, these funds are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as any property, real or personal which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1347, Health Care Fraud, or any offense constituting a "specified unlawful activity" as defined in 18 U.S.C. § 1956(c), and these funds are subject to seizure and forfeiture pursuant to 18 U.S.C. § 981 (a)(1)(A), as any property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957.

**BACKGROUND**

6. Martin R. McLaren ("MCLAREN") is the owner of Pain Management Center ("PAIN MANAGEMENT"), located at 6475 New Hampshire Avenue, Suites 420 and 430, Hyattsville, Maryland. MCLAREN is a licensed anesthesiologist, specializing in pain medicine, and operates under the entity of McLaren Anesthesia Associates, PC. His personal residence is located at xxxx xxxxxxxx xxxxxxx, Bethesda, Maryland. MCLAREN has patients who reside in both Maryland and the District of Columbia.

7. MCLAREN submits bills to various health care benefit programs, as defined in 18 U.S.C. § 24, including the Medicare program, the District of Columbia's Medicaid program, TRICARE, Aetna Insurance Company's health care benefit program ("AETNA"), and CIGNA.

**INVESTIGATION**

8. The present investigation began when TriCenturion, a program safeguard contractor for Medicare, sent a referral to the U.S. Department of Health and Human Services regarding MCLAREN. TriCenturion had conducted a proactive data analysis and determined that MCLAREN was overbilling for Toradol, an anti-inflammatory drug that is administered orally or by injection.

9. In addition, I have been informed that MCLAREN had submitted a high volume of claims relating to mylograph procedures that are rarely performed by a pain management specialist such as MCLAREN, and that are generally performed by radiologists in hospitals instead of medical offices. From 2002 through 2005, MCLAREN submitted over $2 million in claims to Medicare for this procedure and was reimbursed $700,000 for these claims. For the same period of time, he received $143,371 from AETNA, $41,822 from CIGNA, and $40,484

from TRICARE in reimbursements for mylograph procedures. I have been advised by SA Dargis that on April 11, 2006, during an interview, MCLAREN admitted that he does not perform mylograph procedures. Thus, MCLAREN was paid a total of $925,677 for procedures that he has admitted he did not perform.

    10. I have been informed that claims submitted to Medicare by MCLAREN during the time period from December 4, 2003, through December 10, 2003, were examined by investigators involved in this case. The records show that MCLAREN submitted or caused to be submitted 30 claims to Medicare claiming that he had personally provided medical services to different patients during this time period. MCLAREN submitted claims totaling $15,155, and was reimbursed $4,058.29. I have been informed that MCLAREN was in Barbados during that time period and could not have performed the services he claimed in his submissions to Medicare.

    11. I have been informed that investigators involved in this case have examined claims submitted to Medicare by MCLAREN during the time period from November 7, 2005, through November 10, 2005. MCLAREN submitted or caused to be submitted approximately 124 claims to Medicare claiming that he personally performed medical services to different patients during this time period. MCLAREN submitted claims totaling $65,332.42, and was reimbursed $6,320.27. I have been informed that MCLAREN was in Barbados during that time period, and could not have performed the services he claimed in his submissions to Medicare.

    12. This investigation has also uncovered the fact that MCLAREN settled a civil matter with AETNA. During the pendency of that dispute, AETNA requested various patient files from MCLAREN. I have learned that in response to AETNA's request, MCLAREN produced

patients' files to AETNA in which all of the patients' vital signs, including blood pressure and pulse, were identical. I have learned that it is statistically impossible for various patients to have identical vital signs. Based on this information, I have inferred that it is likely that those patients' files were altered as a result of AETNA's investigation.

13. I have been advised that MCLAREN has submitted Medicare claims far in excess of his peers in the Mid-Atlantic pain management field. For example, in 2005, MCLAREN caused Medicare alone to be billed approximately $6.6 million in claims. In 2004, he caused Medicare alone to be billed approximately $7 million in claims. I have been advised by special agents who are experienced in investigating health care fraud and who are involved in this investigation that these volumes of claims are far in excess of MCLAREN's peers' claims and are highly suggestive of false billing.

14. I have been informed that MCLAREN has issued a large volume of prescriptions for controlled narcotics, particularly for oxycontin and percocet. On April 11, 2006, during an interview of MCLAREN's billing manager, investigators were told by the billing manager that many of MCLAREN's patients are "crackheads." I have been advised that, during the execution of a search warrant on MCLAREN's residence on April 11, 2006, special agents observed stacks of U.S. currency in various places in MCLAREN's residence. MCLAREN told the special agents that these were co-payments from his patients and that he saved them up and then deposited them at one time. It is estimated that these stacks of U.S. Currency totaled approximately $20,000-$25,000. In addition, I have been advised that special agents, while executing a search warrant at MCLAREN's residence, observed numerous blank prescription pads and prescriptions in the names of MCLAREN's employees. MCLAREN stated that he had

written prescriptions for his employees for medical reasons, but that they had not used them. Based on my experience and discussion with investigators who investigate health care fraud, doctors who are selling prescriptions for narcotics to drug addicts, often charge health care programs for office visits when the drug addicts only come into the doctor's office to obtain their prescriptions for the narcotics.

## TRACING THE FUNDS

15. SA Dargis contacted the D.C. Department of Health, Medical Assistance Administration (MAA), and requested information regarding MCLAREN'S past Medicaid billings. An MAA investigator advised that in 2004, MCLAREN billed Medicaid in excess of $700,000, with nearly all billed items and procedures rejected by MAA. MCLAREN was reimbursed only $20,000 for this time period by MAA.

16. SA Dargis' review of MCLAREN's billing for Medicare shows the following:

| Year | Amount billed | Amount Denied | Amount Paid |
| --- | --- | --- | --- |
| 2002 | $1,531,617,45 | $1,256,698.23 | $204,159.66 |
| 2003 | $5,453,067.75 | $4,236,793.87 | $918,045.03 |
| 2004 | $7,002,616.65 | $5,421,666.66 | $1,239,049.19 |
| 2005 | $6,648,660.59 | $5,390,316.79 | $984,196.14 |

17. Investigation of MCLAREN indicates that he does not have any other known legitimate source of income and that his main income is derived from his pain clinic. I have identified 16 bank accounts and investment accounts at Wachovia Bank, Bank of America, and TIAA-CREF Mutual Funds, associated with MCLAREN, his wife, his children, and his business. Some of these accounts contain millions of dollars. MCLAREN's wife works at PAIN

MANAGEMENT. From records I reviewed, she receives approximately $90,000 per month. MCLAREN told investigators on April 11, 2006, that his wife takes dictation.

18. MCLAREN's business account, Account No. xxxxxx7669 is a Bank of America account and is held in the name of McLaren Anesthesia Associates, PC. On April 11, 2006, MCLAREN told investigators that the reimbursements for his billings to Medicare, Medicaid, and private insurance companies were deposited into this account. MCLAREN also has a personal account, Account No. xxxxxxxxxx1887 at Bank of America, held in the name of Martin R. McLaren. I have reviewed bank records which show transfers of monies from the business account to MCLAREN's personal account, including a transfer of $170,000 in December 2005, and a transfer of $200,000 in 2004.

## CONCLUSION

19. In summary, based on the foregoing information, there is probable cause to believe that any and all funds contained in the following bank accounts, **Account # xxxxxxxxxx1887, held in the name of Martin R. McLaren and Account # xxxxxx7669, held in the name of McLaren Anesthesia Associates, PC,** are traceable to monies obtained by MCLAREN through health care fraud in violation of 18 U.S.C. § 1347, and laundered by MCLAREN, and are, therefore, subject to seizure and forfeiture under 18 U.S.C. §§ 981 (a)(1)(A) and (C), in that these

funds represent property, real or personal, which constitutes or are derived from proceeds traceable to violations of 18 U.S.C. § 1347, and, in that these funds represent property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956 or 1957.

                                                      _____
                                                      Paul M. Cavanagh, Special Agent
                                                      Federal Bureau of Investigation
                                                      United States Department of Justice

SWORN TO AND SUBSCRIBED before me this _____ day of April, 2006

_____
_____United States Magistrate Judge
       for the District of Columbia

8